# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

PINNACLE GREAT PLAINS
OPERATING COMPANY, LLC,

      Plaintiff,

      v.

KIRK SWENSON,

      Defendant.

Case No. 1:17-cv-00120-DCN

**MEMORANDUM DECISION AND
ORDER**

## I. INTRODUCTION

This matter comes before the Court on Plaintiff Pinnacle Great Plains Operating

Company, LLC's ("Pinnacle") Motion to Consolidate Cases (Dkt. 12) and Defendant

Kirk Swenson's Motions for Summary Judgment (Dkt. 13) and Partial Dismissal (Dkt.

20). This dispute arose out of Pinnacle's purchase of a 5,487-acre parcel of agricultural

land near Malta, Idaho, known as "Bridge Farms," from the Wynn Dewsnup Revocable

Trust ("the Trust"). In this case ("*Pinnacle II*"), Pinnacle claims that Swenson—acting as

president of 1 Stop Realty ("1 Stop"), Pinnacle's purported broker for the purchase—

misrepresented the quality of the groundwater and soil at Bridge Farms prior to the sale. 1

Stop, the Trust, and Wynn Dewsnup, the Trustee of the Trust, are the defendants in a

companion case in this District ("*Pinnacle I*").[1]

---

[1] The case number for the companion case is 4:13-cv-106-DCN.  Judge Edward Lodge
transferred *Pinnacle I* to the undersigned on August 1, 2017.  *Id.*, Dkt. 96.

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(2)(ii). For the reasons set forth below, the Court grants the Motion for Partial Dismissal, grants the Motion for Summary Judgment in part, and stays the remainder of the claims until a final judgment has been entered in *Pinnacle I*.

## II. BACKGROUND

### *A. Factual Background*

Pinnacle is an Arkansas limited liability company with a single member, the Arkansas Teacher Retirement System ("ATRS"), an institutional pension fund. Pinnacle owns investment farmland properties on behalf of and for the benefit of the ATRS. Pinnacle contracted with Halderman Farm Management Services ("HFMS") to acquire and manage investment farmlands on ATRS's behalf. HFMS employs Howard Halderman, David Martin, and Adam Gore.

Swenson is the president of 1 Stop. 1 Stop has an office in Kasson, Minnesota, where Swenson and 1 Stop's vice president, Wendy Forthun ("Forthun"), reside. 1 Stop also has an office located about 50 miles away in Olivia, Minnesota, where 1 Stop's other vice president, Roger Heller ("Heller"), resides.

In early 2010, 1 Stop's client, Teays River Investments, LLC ("Teays"), expressed interest in expanding into the northwest United States and sought 1 Stop's services in its

search for farmland in which to invest. Shortly thereafter, Heller discovered Bridge

Farms and began preparing paperwork on the property to present to Teays.[2]

In May of 2010, Heller and Swenson travelled to Idaho to tour Bridge Farms. On

May 24, 2010, Heller sent Bridge Farms an email requesting information on, among other

things, the economics of growing different kinds of crops at Bridge Farms, rental income,

and water and soil quality. Dkt. 16-5. On May 25, 2010, Garrett Dewsnup, Bridge Farms'

manager responded via fax with a letter and a collection of documents. Dkt. 16-6. Among

these documents was an "irrigation water analysis" from 2009, (*id.* at 16), and "water

analysis results" from 2003, (*id.* at 17). The 2003 lab results indicated "possible" and

"significant" problems with Bridge Farms' water. *Id.* Heller also spoke with Bridge

Farms' crop consultant, Kyle Carpenter, to discuss Bridge Farm's soil and water quality.

In July of 2010, Swenson gained the impression that Teays did not want to

purchase Bridge Farms because it was not large enough. Thereafter, 1 Stop ceased

investigating Bridge Farms as a prospect for Teays.

On December 29, 2010, Halderman emailed Swenson asking for assistance in

finding farmland for a client (ATRS) for investment purposes. *Pinnacle I*, Dkt. 64-2, at

21. On January 17, 2011, Swenson emailed Halderman to inform him about Bridge

Farms. *Id.* at 23.

In June 2011, Wynn Dewsnup emailed Heller a "lease proposal" for Bridge Farms

"presented by" one of its tenants, Grant 4-D Farms. Dkt. 16-12. The proposal stated that

---

[2] The parties presented background information about Teays in *Pinnacle I*. *See* 4:13-cv-106, Dkt. 90, at 4-5 (citing Dkt. 62-2, at 20).

the property has "both soil and water borne salt challenges" that require farmers to utilize "sustainable farming practices." *Id.* at 7.

Swenson emailed Halderman again about Bridge Farms on July 20, 2011. Dkt. 16-4. The two men exchanged a few emails over the next few days about Bridge Farms' water. *Id.* Swenson indicated the water supply was "good" and "very adequate." *Id.*

On July 26, 2011, Forthun sent an email to Halderman, Swenson, and others, with a short summary of information about Bridge Farms and several other documents attached. Dkt. 16-13. The summary indicated the property was currently producing potatoes and sugar beets, had "quality ground water," and had "low saline levels" in the "primary soil." *Id.* at 4. 1 Stop and HFMS continued to discuss Bridge Farms into August of 2011. Dkt. 16-14. In one email, Swenson asserted the property should be easy to rent because it was "proven beet & potato ground." *Id.* at 2.

Pinnacle entered into a letter of intent in late September 2011 to purchase Bridge Farms. The parties to the sale signed a Real Estate Purchase Agreement on October 14, 2011. At that time, Bridge Farms' wells had already been winterized. Believing that the property did not have water problems, Pinnacle did not require well testing as part of its due diligence. Rather, HFMS employees visited Bridge Farms in November of 2011 and spoke to Wynn Dewsnup about Bridge Farms' water quality. Wynn represented that the Farm had "excellent" irrigation water. Swenson maintains that no one ever asked him or 1 Stop to conduct due diligence for Pinnacle's purchase of Bridge Farms. Dkt. 16-22, at 63.

The sale of Bridge Farms for $15,300,000 formally closed in January of 2012. A few months later, in May of 2012, Pinnacle learned about the water problems at Bridge Farms.

### B. Procedural Background

On March 5, 2013, Pinnacle filed suit (*Pinnacle I*) against Wynn Dewsnup and the Trust for breaching its obligation under the Bridge Farms purchase agreement. On October 13, 2014, ten days after receiving responses to its first set of written discovery, Pinnacle moved for leave to amend its complaint to assert fraud claims against Wynn Dewsnup. In November of 2014, Pinnacle deposed Wynn and Garrett Dewsnup and learned that Garrett had given Heller information about Bridge Farms' water and soil quality in 2010. Shortly thereafter, Pinnacle sent a third-party subpoena to 1 Stop, and Swenson responded on behalf of 1 Stop with over 3,000 pages of materials related to the Bridge Farms sale. On December 12, 2014, Pinnacle moved to add 1 Stop as a defendant.

On February 23, 2015, the Court granted Pinnacle's pending requests. On February 24, 2015, Pinnacle filed its Second Amended Complaint adding 1 Stop as a defendant and adding fraud claims.[3]

Nearly one month later, 1 Stop Realty filed a third-party complaint against Robert Jones Realty, Inc., the Trust's broker during the sale of Bridge Farms. On April 6, 2015,

---

[3] The Second Amended Complaint asserted six causes of action. Pinnacle asserted the first three—(1) breach of contract; (2) breach of the covenants of good faith and fair dealing; and (3) fraudulent inducement—against the Trust and Wynn Dewsnup. Pinnacle asserts the final three—(4) violation of Idaho's Real Estate Brokerage Representation Act; (5) negligence per se; and (6) fraud—against 1 Stop.

Wynn Dewsnup and the Trust filed their answer to the Second Amended Complaint and filed a cross-claim against 1 Stop. On June 11, 2015, in response to a written discovery request, 1 Stop produced documents related to its work and investigation of Bridge Farms that 1 Stop Realty had collected when it was representing Teays. These disclosures included the 2003 Bridge Farms water analysis lab results, Swenson's personal notes from a 2010 telephone conference with Wynn Dewsnup which acknowledge, among other points, "salts + sodium in soils," and emails between Heller and Swenson, which revealed that Heller had spoken to an agronomist regarding Bridge Farms' long term sustainability and the salinity of its soils.

On October 7, 2015, the Court dismissed the third-party complaint against Robert Jones Realty. On November 2, 2015, the Court issued an Amended Case Management Order establishing new deadlines for the completion of factual discovery, expert disclosures, mediation, and dispositive motions, and setting trial for January 25, 2017. On January 7 and 8, 2016, Pinnacle deposed Swenson and Heller. Pinnacle alleges 1 Stop brought to the depositions a file of documents relating to Bridge Farms which contained more evidence of 1 Stop's knowledge of the property's soil and water problems.

On March 14, 2016, Pinnacle moved to amend its pleadings again, this time to add Swenson to the case. On March 31, 2016, Wynn Dewsnup and the Trust moved to add Swenson and Heller as cross-defendants and assert new claims against them.

Magistrate Judge Candy Dale took the motions under consideration and, on July 26, 2016, issued a Report and Recommendation, recommending that the Court deny Pinnacle's motion to amend as untimely. Specifically, Judge Dale found, among other

things, that Pinnacle had not been diligent in seeking to add Swenson as a party—

Pinnacle could have moved to add Swenson as a defendant as early as November of

2014, but it waited until March of 2016. Judge Dale also found adding Swenson would

prejudice 1 Stop and Swenson, and would significantly disrupt the deadlines in the

current case management order without good cause.

On February 9, 2017, Judge Edward Lodge adopted the Report and

Recommendation and denied the motion for leave to amend. In the meantime, the parties

had reached several settlement agreements. In October of 2016, the Court had dismissed

with prejudice all cross-claims and causes of action that were or might have been asserted

by Wynn Dewsnup or the Trust against 1 Stop in this case; and all cross-claims and

causes of action that were or might have been asserted by Pinnacle against Wynn

Dewsnup or the Trust. After these dismissals, the only remaining claims were asserted by

Pinnacle against 1 Stop.

Thereafter, Judge Lodge considered 1 Stop's Motion for Summary Judgment. He

denied the Motion in March of 2017. The Court then set a jury trial for May 15, 2018.

However, the Court vacated this trial date when Judge Lodge transferred the case to the

undersigned on August 1, 2017.

Meanwhile, on October 7, 2016, Pinnacle had filed this case, *Pinnacle II*, against

Swenson in state court in Cassia County, Idaho. This was after Magistrate Judge Dale's

Report and Recommendation recommending that Swenson not be added as a party to

*Pinnacle I* but before Judge Lodge adopted that Report and Recommendation. However,

Pinnacle did not serve Swenson until February 25, 2017—after Judge Lodge ruled that

Pinnacle could not add Swenson to *Pinnacle I*. Swenson timely removed the case to this Court on March 5, 2017.

Pinnacle's Complaint asserts five claims for relief against Swenson: (1) violation of Idaho's Real Estate Brokerage Representation Act ("Brokerage Act"), Idaho Code § 54-2082 *et seq.*; (2) fraud; (3) negligence; (4) breach of contract; and (5) breach of the implied covenant of good faith and fair dealing.

On June 14, 2017, Pinnacle filed the pending Motion to consolidate this case with *Pinnacle I*. Two days later, Swenson filed the pending Motion for Summary Judgment. Finally, on August 11, 2017, Swenson filed a Motion for Partial Dismissal, in which he asked the Court to dismiss Pinnacle's negligence claim. Pinnacle has indicated that it does not oppose this Motion for Partial Dismissal. The negligence claim is, therefore, no longer at issue in this case.

## III. LEGAL STANDARDS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor." *Id*. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted).

Accordingly, this Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

Federal Rule of Civil Procedure 42(a) provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." "Rule 42(a) sets forth no situations in which consolidation must be granted." *United States v. Parkinson*, No. CIV-98-340-E-BLW, 2000 WL 1902246, at *1 (D. Idaho Oct. 25, 2000). Rather, "[t]he district court has broad discretion under this rule to consolidate cases pending in the same district." *Investors Research Co. v. United States Dist. Ct. for Cent. Dist. of Cal.*, 877 F.2d 777 (9th Cir. 1989). In determining whether to consolidate two cases, "the Court must 'weigh[ ] the saving of time and effort consolidation would produce against any inconvenience, delay or expense that it would cause.'" *W. Watersheds Project v. Lueders*, No. 1:13-CV-00261-EJL, 2014 WL 12611291, at *1 (D. Idaho Mar. 13, 2014) (quoting *Single Chip Systems Corp. v. Intermec IP Corp.*, 495 F.Supp.2d 1052, 1057 (S.D. Cal. 2007)).

# IV. ANALYSIS

Swenson argues summary judgment is proper for three reasons: (A) Pinnacle's claims against Swenson are time-barred by the applicable statute of limitations; (B) Pinnacle is barred by the doctrine of claim preclusion from bringing claims that were raised or could have been raised in *Pinnacle I*; and (C) Pinnacle's claims against Swenson are duplicative of the claims Pinnacle asserts against 1 Stop in *Pinnacle I* and should be dismissed. The Court addresses each of these arguments in turn.

## A. Whether Pinnacle's Claims Against Swenson Are Time-Barred

There are three main claims left at issue in this case: (1) fraud; (2) violation of the Brokerage Act; and (3) breach of contract. The Court addresses the statute of limitations for the fraud claim first, and then address the remaining claims together.

### 1. Fraud

"The statute of limitation for fraud is three years." *Nerco Minerals Co. v. Morrison Knudsen Corp.*, 90 P.3d 894, 900 (2004) (citing Idaho Code § 5–218). A claim for fraud "accrues upon discovery by the aggrieved party of facts constituting fraud." *Id.* (citing I.C. § 5–218(4)). The date of discovery is generally "a fact question for the jury unless there is no evidence creating a question of fact." *Id.* (citing *DBSI/TRI v. Bender*, 948 P.2d 151, 162 (1997)). However, the Court will infer actual knowledge of the fraud "if the aggrieved party could have discovered the fraud by reasonable diligence, although the Court will hesitate to infer such knowledge." *Id.* (citing 948 P.2d at 162).

Pinnacle filed this suit against Swenson on October 7, 2016. Thus, any claim that accrued prior to October 7, 2013, is time-barred.

Swenson argues the claim is time-barred because Pinnacle should have learned about the basis for its fraud claim in May of 2012 when it first became aware of Bridge Farms' water and soil problems. Swenson explains that, at that time, Pinnacle knew 1 Stop had not raised the issue of water and soil quality prior to the sale and it could have questioned 1 Stop, Swenson, and Wynn Dewsnup to determine whether Swenson knew about the water and soil issues and, if so, whether they withheld that information from Pinnacle. Moreover, in November of 2012, Dewsnup told Pinnacle that he had provided Pinnacle with information about Bridge Farms' water quality prior to the sale. Swenson argues that had Pinnacle investigated that statement, it would have discovered Dewsnup was referring to information Dewsnup had given to Swenson.

Pinnacle argues that, at the earliest, it learned of Swenson's fraudulent withholding of information in November of 2014, when it deposed Garrett Dewsnup. Pinnacle asserts that it considered Swenson a trusted agent and had no inkling that Swenson concealed information from it and would later deny acting as its broker. Finally, Pinnacle maintains that Swenson's argument, that he would have freely disclosed his fraudulent activity had Pinnacle simply asked in 2012, is fallacious.

Both sides have presented meritorious arguments. At this time, it is not the Court's job to determine which version of events is more plausible. Pinnacle has carried its burden of setting forth sufficient facts upon which a jury could find its fraud claim is not time-barred. Accordingly, the Court finds the date of accrual is a dispute of fact that must be determined by a jury.

## 2. Brokerage Act Claim and Breach of Contract Claims

In addressing the remaining claims, the Court first must determine what statute of limitations applies. Swenson asserts that, under Idaho Code § 5-218(1), a three-year statute of limitations applies to the Brokerage Act claim because the Act itself does not provide for a statute of limitations. Pinnacle does not challenge this assertion; however, the Court questions whether it is accurate. The Idaho Supreme Court, in *Sumpter v. Holland Realty, Inc.*, applied the four-year statute of limitations period provided for in Idaho Code § 5-224 to the plaintiffs' claims that the defendant violated certain contractual duties that the Brokerage Act also imposed on the defendant. 93 P.3d 680, 684–85 (Idaho 2004). Significantly, the *Sumpter* court found the claim sounded in tort, not contract, because the plaintiffs could have maintained their claim "without the contract by virtue of a statutory or common law duty." *Id.* at 685. In other words, the *Sumpter* court applied a four-year statute of limitations to a claim that a defendant had violated duties imposed by the Brokerage Act. The Court finds *Sumpter* equivalent to the present case.

Swenson also asserts that the contract claim is controlled by the three-year statute of limitations provided by Idaho Code § 5-218(1) because the contract claim is, in substance, really another claim for violation of the Brokerage Act, not a contract claim. Pinnacle summarily asserts that the four-year statute of limitations, applicable to claims arising out of oral contracts under Idaho Code § 5-217, applies to the contract claim, but does not directly address Swenson's arguments. The Court agrees with Swenson's characterization of the contract claims, but, again finds *Sumpter* applicable. Like in

*Sumpter*, the duties Pinnacle alleges Swenson breached are independently imposed by the Brokerage Act. *See* 93 P.3d at 684–85. The Court, therefore, finds the four-year statute of limitations provided for in Idaho Code § 5-224 applicable to both the Brokerage Act claim and the contract claims. Applying a four-year statute of limitations, these claims are time-barred if they accrued prior to October of 2012.

The Court next faces the question of when these claims accrued. A breach of contract claim accrues when the defendant breaches the contract. *Spence v. Howell*, 890 P.2d 714, 721 (1995). Pinnacle asserts that Swenson entered into a contract with it to act as its real estate broker and that Swenson breached this contract by, among other things, failing to disclose information to Pinnacle about Bridge Farms' soil and water quality. Thus, at the latest, the alleged breach occurred when the sale closed in January of 2012. This claim is thus time-barred as it occurred prior to October of 2012.

It is not as clear when a claim for violation of the Brokerage Act accrues. However, the Court finds *Jones v. Runft, Leroy, Coffin & Matthews, Chartered*, informative. 873 P.2d 861, 867 (1994). There, the Idaho Supreme Court considered when a tort action for breach of an "assumed duty" accrued. *Id.* The court explained that "[t]his analysis focuses upon the acts complained of and does not require an analysis of when the plaintiff *discovered* either the acts complained of or the damage resulting from those acts." *Id.* Nevertheless, because a plaintiff must prove damages to succeed on a tort claim, the claim does not accrue until "some damage has occurred." *Id.* (quoting *Stephens v. Stearns*, 678 P.2d 41, 46 (1984)). Pinnacle alleges that Swenson violated the Brokerage Act by, among other things, failing to disclose adverse material facts that he knew or

should have known about Bridge Farms' water and soil quality, disclosing its internal pricing strategy to Dewsnup, and failing to notify Pinnacle that it should have a professional assess Bridge Farms' water. All of these alleged violations occurred prior to the closing of the sale in January of 2012. However, Pinnacle did not incur damages immediately. Pinnacle first realized it was suffering damages in May of 2012 when it discovered that the salt in Bridge Farms' irrigation water was killing crops on the property. The Court finds that "some damage occurred," at the latest, in May of 2012. Applying a four-year statute of limitations, this claim is also time-barred.

Nevertheless, Pinnacle argues that equitable estoppel bars Swenson's statute of limitations argument. The Idaho "Supreme Court has held that a defendant may be estopped to assert the statute of limitation as a defense if his statements or conduct induced the plaintiff to refrain from prosecuting his action during the statutory limitation period." *Zumwalt v. Stephan, Balleisen & Slavin*, 748 P.2d 406, 409 (Idaho Ct. App. 1987). There are four elements of equitable estoppel:

> (1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth, (2) the party asserting estoppel did not know or could not discover the truth, (3) the false representation or concealment was made with the intent that it be relied upon and (4) the person to whom the representation was made or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

*Theriault v. A.H. Robins Co.*, 698 P.2d 365, 369 (Idaho 1985) (citation omitted). Pinnacle argues that Swenson should be estopped from presenting a statute of limitations defense because he intentionally concealed evidence. In November of 2014, Pinnacle issued a third-party subpoena to 1 Stop. Swenson responded on behalf of 1 Stop with over 3,000

pages of documentation on November 26, 2014. Apparently, Swenson did not provide all of the documents in 1 Stop's possession that showed Swenson and 1 Stop had knowledge of the water and soil quality at Bridge Farms. Specifically, Swenson failed to provide the documentation 1 Stop had gathered while investigating Bridge Farms for Teays. Swenson later provided these documents in June of 2015. Swenson asserts that, at most, the failure to provide the documents in November of 2014 was inadvertent. 1 Stop maintains separate files for each entity it works with, not each property it investigates. Accordingly, in November of 2014, when Pinnacle asked for documents related to Pinnacle's purchase of Bridge Farms, Swenson only searched 1 Stop's records for documents related to Pinnacle, not related to Bridge Farms.

Again, both parties have provided viable versions of the facts. At first it appears that summary judgment is inappropriate because Pinnacle has raised a material issue of fact "as to whether [Swenson] should be equitably estopped from raising the statute of limitations as a defense." *Id.* at 370. However, upon closer examination, Pinnacle has not sufficiently argued that Swenson's conduct "dissuaded [it] from prosecuting his or her cause of action *during the statutory period*." *Id.* at 369 (emphasis added). Even assuming Swenson concealed information between November 2014 and June 2015, Pinnacle would have discovered the basis for its Brokerage Act and contract claims in June of 2015, seven months before the contract claims expired and eleven months before the Brokerage Act claim expired. Thus, Pinnacle's "delay in filing suit was [not] *attributable to*" Swenson's alleged six-month concealment of relevant documents. *See Zumwalt v. Stephan, Balleisen & Slavin*, 748 P.2d 406, 410 (Idaho Ct. App. 1987). Moreover, the

doctrine of equitable estoppel does not toll the statute of limitations during the alleged six-month concealment.

In sum, the Court finds the Brokerage Act claims and contract claims are barred by the statute of limitations and Swenson is not estopped from asserting the statute of limitations as a defense. The Court, therefore, grants summary judgment in favor of Swenson on these claims. Pinnacle's fraud claim is the only remaining claim at issue.

*B. Whether Pinnacle's Fraud Claim is Barred by the Doctrine of Claim Preclusion*

Swenson next argues that Pinnacle's claims are barred by the doctrine of claim preclusion. "Claim preclusion treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same claim or cause of action." *Pragovich v. I.R.S.*, No. MC08-6422-S-EJL, 2009 WL 73774, at *3 (D. Idaho Jan. 8, 2009) (quoting *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir. 1988)). When asserted by a defendant, claim preclusion can "bar[ ] all grounds for recovery which could have been asserted, whether they were or not, in a prior suit between the same parties (or their privies) on the same cause of action." *Id.* (quoting *Ross v. Int'l Bhd. of Elec. Workers*, 634 F.2d 453, 457 (9th Cir. 1980)). Claim preclusion applies when there is: "(1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between parties." *Stewart v. U.S. Bancorp,* 297 F.3d 953, 956 (9th Cir. 2002).

*Pinnacle I* is still pending. Thus, there is not an obvious "final judgment on the merits" that might bar Pinnacle's fraud claim. Nevertheless, Swenson argues that Judge Lodge's decision denying Pinnacle leave to amend its complaint in *Pinnacle I* to add Swenson as a defendant was "a final judgment on the merits."

As an initial matter, Swenson has failed to cite binding authority in support of this assertion. The Court agrees that, where a plaintiff seeks to add additional claims against an existing defendant and the court denies leave to amend, claim preclusion applies to those additional claims. *See N. Assur. Co. of Am. v. Square D Co.*, 201 F.3d 84, 88 (2d Cir. 2000). However, "the actual decision denying leave to amend is irrelevant to the claim preclusion analysis." *Id.* Rather, "the bar is based on the requirement that the plaintiff must bring all claims at once against the same defendant relating to the same transaction or event." *Id.* Thus, where a plaintiff seeks to add claims against *a new defendant* and the court denies leave to amend, claim preclusion may not apply. *Id.* Here, Pinnacle has asserted new claims against a new defendant; therefore, denial of leave to amend to add Swenson as a defendant in *Pinnacle I* did not automatically trigger claim preclusion. Moreover, the Court finds that a claim-splitting or duplicative litigation defense is more appropriate where, as here, there has not been a clear final judgment on the merits. *See Long v. TRW Vehicle Safety Sys., Inc.*, No. CV-09-2209-PHX-DGC, 2010 WL 729465, at *5 (D. Ariz. Feb. 26, 2010). Accordingly, the Court turns to Swenson's claim-splitting defense.

### C. Whether *Pinnacle II* is Duplicative of *Pinnacle I*

"Plaintiffs generally have 'no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant.'" *Adams v. California Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007) (citation omitted). If a later-filed action is duplicative of an earlier filed action, the Court may, in its discretion "[a]fter weighing the equities of the case," "dismiss a duplicative later-filed

action, . . . stay that action pending resolution of the previously filed action, . . . enjoin the parties from proceeding with it, or . . . consolidate both actions." *Id.*

In *Adams*, the Ninth Circuit explained that, in determining whether a second action is duplicative of a previously filed action, courts should examine (1) whether the causes of action and relief sought are the same in both cases and (2) whether "the parties or privies to the action" are the same. *Id.* at 689. This test draws on "the test for claim preclusion," *id.* at 688, but it is not identical to that test.

Under the first prong of this two-part test, the court considers four criteria to determine whether the causes of action are the same:

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Id.* at 689 (quoting *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201–02 (9th Cir. 1982). "The last of these criteria is the most important." *Id.* (quoting *Constantini*, 681 F.2d at 1202).

In addressing the second prong, the *Adams* court utilized the "virtual representation" test to determine whether the parties or privies were the same. *Id.* at 691. "The necessary elements of virtual representation are an identity of interests and adequate representation. Additional features of a virtual representation relationship include 'a close relationship, substantial participation, and tactical maneuvering.'" *Id.* (citation omitted).

Pinnacle argues that the "virtual representation" test is no longer good law after the Supreme Court's decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008). In *Taylor*, the

Supreme Court addressed whether claim preclusion barred a successive Freedom of Information Act lawsuit, filed by a different plaintiff seeking the same document as a prior plaintiff. The Court disapproved of the "virtual representation" test the D.C. Circuit had applied to determine whether the parties were sufficiently related such that the person who was not a party to the first suit could be precluded from having a full and fair opportunity to litigate his claims at a later date. *Id.* at 904. In its place, the Court outlined six categories of exceptions to the general rule forbidding nonparty preclusion. *Id.* at 893-94 & n.6. First, a "person who agrees to be bound by the determination of issues in an action between others is bound . . . ." *Id.* at 893. Second, certain "pre-existing substantive legal relationships between the person to be bound and a party to the judgment" will bind certain non-parties. *Id.* at 894 (internal quotations omitted). Third, "in certain limited circumstances, a nonparty may be bound by a judgment [if] she was adequately represented by someone with the same interests who was a party to the suit." *Id.* (internal quotation omitted). Fourth, "a nonparty is bound by a judgment if she assumed control over the litigation in which the judgment was rendered." *Id.* (internal quotation omitted). Fifth, "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy." *Id.* Sixth, "in certain circumstances, a special statutory scheme may expressly foreclose successive litigation by nonlitigants . . . if the scheme is otherwise consistent with due process." *Id.* (alteration in original)

The Court agrees with Swenson that *Taylor* addressed a different scenario than that at issue in *Adams* and at issue here. In *Taylor*, two different plaintiffs tried to bring the same claim against the same defendant at different times. Here, as in *Adams*, the same

plaintiff brought the same claims against two different defendants. Therefore, while the Court acknowledges *Taylor* disapproved of the virtual representation test, the Court does not find that the six category "framework" the *Taylor* Court announced should *necessarily* apply to this case as the cases involve substantially different interests. Nevertheless, in the absence of guiding case law, the Court will examine both in assessing the second prong of the claim-splitting test.

<u>1. Same Causes of Action</u>

The Court first examines whether the causes of action in Pinnacle's two suits are the same. The Court finds that they are. First, and most importantly, both suits arise out of the same transactional nucleus of facts. Both suits arise from the sale of Bridge Farms and recite identical facts. In *Pinnacle I*, Pinnacle asserts that 1 Stop acted as its real estate broker for the sale and breached its duty to disclose to Pinnacle adverse material facts about the property which 1 Stop actually knew or should have known.  In *Pinnacle II*, Pinnacle asserts that Swenson, acting as president of 1 Stop, acted as its real estate broker for the sale and breached his duty to disclose to Pinnacle adverse material facts about the property which he knew or should have known. Second, the parties will present the same evidence in the two actions to prove the same allegations that the parties have made in both cases. Pinnacle has not identified any evidence that it will present in *Pinnacle II* that it will not also present in *Pinnacle I*. Third, both actions involve the infringement of the same rights. In both cases, Pinnacle asserts fraud claims and asks for actual damages.

The only criteria Pinnacle substantively challenges is the first criteria: whether rights or interests established in the first case would be destroyed or impaired by

prosecution of the second action. Pinnacle insists that in order for this criteria to be satisfied there must be a final judgment in *Pinnacle I*. The Court disagrees. If that were accurate, the claim-splitting test would be repetitive of the claim preclusion test. Instead, "in the claim-splitting context, the appropriate inquiry is whether, *assuming that the first suit were already final*, the second suit could be precluded pursuant to claim preclusion." *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 987 n.1 (10th Cir. 2002) (emphasis added) (quoted in *Adams*, 487 F.3d at 689); *see also Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1059 (S.D. Cal. 2007) (explaining that claim splitting is not synonymous with claim preclusion in that claim splitting does not require a final judgment on the merits). The Court finds this criterion is satisfied because, if both cases were to proceed to trial, the two juries could reach inconsistent results. For example, the jury in *Pinnacle I* could find 1 Stop did not act fraudulently, while the jury in *Pinnacle II* could find Swenson, acting as president of 1 Stop, did act fraudulently.

Because all four relevant criteria are satisfied, the Court finds the same causes of action are present in both actions.

## 2. Same Parties or Privies

As stated above, the Court will look at both the virtual representation test applied in *Adams* and the six-exception framework applied in *Taylor* to determine if the same parties or privies are present in both *Pinnacle I* and *Pinnacle II*.

### a. Virtual Representation Test

An "identity of interests and adequate representation are *necessary* to . . . a finding" that a defendant in a first-filed action virtually represents a defendant in a

second-filed action. *Kourtis v. Cameron*, 419 F.3d 989, 996 (9th Cir. 2005). Under the virtual representation test, the Court also looks at whether the defendants in both actions have a close relationship and whether the defendant in the second-filed action participated substantially in the first action. *Id.* (quoting *Irwin v. Mascott*, 370 F.3d 924, 930 (9th Cir. 2004)). "In *Irwin*, for example, [the Ninth Circuit] concluded that a corporation was the virtual representative of its senior corporate officer. In so holding, [the Ninth Circuit] emphasized that the officer was intimately involved in the earlier litigation and that there was 'no assertion that [the officer's] interests diverged' from the corporation's." *Id.* at 996–97 (quoting *Irwin*, 370 F.3d at 930–31). Similarly here, the two defendants have a close relationship, Swenson has been involved substantially in *Pinnacle I* (by providing documents during discovery and participating in depositions), and no one has asserted that Swenson's interests diverge from 1 Stop's. Therefore, 1 Stop, a company, is the virtual representative of Swenson, the president of 1 Stop.

Pinnacle asserts that the two parties do not have the same interests because both Swenson and 1 Stop can be independently liable for fraud. It is true that a corporate officer "who personally participates in a tort," such as fraud, "is personally liable to the victim, even though the corporation might also be vicariously liable." *Forbush v. Sagecrest Multi Family Prop. Owners' Ass'n, Inc.*, 162 Idaho 317, 396 P.3d 1199, 1214 (2017) (quoting *Eliopulos v. Knox*, 848 P.2d 984, 988 (Idaho Ct. App. 1992)). However, the virtual representation test does not ask the Court to look at whether the two defendants can be independently liable. Rather, the test directs the Court to look at whether the two defendants' interests conflict or align. 1 Stop has maintained that its

employees did not act fraudulently; thus, "[n]o conflicts central to the issues in this litigation exist between" Swenson and 1 Stop. *See Adams*, 487 F.3d at 692. Therefore, the Court finds the virtual representation test has been satisfied.

*b.* Taylor *Exceptions*

Second, under the framework outlined in *Taylor*, one of six exceptions must apply for the Court to find the same parties or privies are present in both *Pinnacle I* and *Pinnacle II*. Of the six exceptions, two might possibly apply to Swenson. First, two parties can be in privity based on a "pre-existing substantive legal relationships between the person to be bound and a party to the judgment." *Id.* at 894 (internal quotations marks omitted). "Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* Second, a nonparty may be in privity with a party for purposes of the claim-splitting test if "she was adequately represented by someone with the same interests who was a party to the suit." *Id.* (internal quotation marks omitted). Examples include, a proper class action representative, a trustee, a guardian, or other fiduciary. *Id.* The Court finds that the relationship between 1 Stop and Sweson establishes privity under both exceptions.

The Ninth Circuit has long acknowledged that a president or other officer with enough control of a corporation can have sufficient commonality of interests with the corporation to establish privity. *W. Radio Servs. Co., Inc. v. Glickman*, 123 F.3d 1189, 1196 (9th Cir. 1997) (finding privity existed between a corporation and its president where the president was "deeply involved and fully informed" with respect to corporate affairs); *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983). 1 Stop is a small

corporation with just a few employees. However, it is not clear from the record whether Swenson, as president, has sufficient control over 1 Stop to create this type of privity.

More importantly, however, the Ninth Circuit has also recognized that a principal-agent relationship establishes privity, especially where the principal is vicariously liable for the torts of its agents. *See Spector v. El Ranco, Inc.*, 263 F.2d 143, 145 (9th Cir. 1959) ("Where, as here, the relations between two parties are analogous to that of principal and agent, the rule is that a judgment in favor of either, in an action brought by a third party, rendered upon a ground equally applicable to both, is to be accepted as conclusive against the plaintiff's right of action against the other."); *Davis Wright & Jones v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 709 F. Supp. 196, 202 (W.D. Wash. 1989), *aff'd* 897 F.2d 1021 (9th Cir. 1990); Restatement (Second) of Judgments § 51 (1982). In fact, the Ninth Circuit has equated the principal-agent relationship to that of "landlord and tenant, . . . master and servant, [and] bailor and bailee" in discussing privity and res judicata. *See Hurley v. S. Cal. Edison Co.*, 183 F.2d 125, 135 (9th Cir. 1950). Thus, the Court finds a principal-agent relationship is the type of "pre-existing substantive legal relationship[]" *Taylor* recognized as establishing privity. 553 U.S. at 894. The Court also notes that the *Taylor* court acknowledged the controlling effect of a principal-agent relationship, even if it did not specifically list the type of principal-agent relationship at issue here as an exception. *See id.* at 895. ("[P]reclusion is appropriate when a nonparty later brings suit as an agent for a party[, the principal,] who is bound by a judgment.").

It is undisputed that 1 Stop and Swenson have a principal-agent relationship and that 1 Stop will be vicariously liable for any fraud committed by Swenson while acting in

his capacity as president of 1 Stop. Significantly, Pinnacle has not alleged that Swenson committed fraud outside of his capacity as president of 1 Stop. Accordingly, the Court concludes that 1 Stop and Swenson are in privity under both the virtual representation test and the exceptions framework laid out in *Taylor*.

### 3. Remedy

As both prongs of the claim-splitting test are satisfied, the Court next addresses whether to dismiss *Pinnacle II*, to stay that action pending resolution of *Pinnacle I*, or to consolidate both actions. *Adams*, 487 F.3d at 688.

The Court hesitates to consolidate *Pinnacle I* and *Pinnacle II* after Judge Lodge denied Pinnacle leave to add Swenson as a defendant. The Court acknowledges that the Court's previous concerns about postponing a set trial date are not as pressing as the trial date in *Pinnacle I* has been vacated. However, the Court's other concerns are still present. Pinnacle could have added Swenson as a defendant much earlier and Swenson will be at a disadvantage if he is added to *Pinnacle I* at this late stage in the litigation. Moreover, the Court finds the request to consolidate is really Pinnacle's "attempt to avoid the consequences of [its] own delay and to circumvent the . . . court's denial of [the] untimely motion for leave to amend" in *Pinnacle I*. *See id*. Accordingly, the Court finds consolidation is inappropriate and denies Pinnacle's motion to consolidate.

Nevertheless, the Court acknowledges that Swenson may be independently liable for fraud. In order to avoid conflicting jury verdicts, the Court finds it appropriate to stay *Pinnacle II* until a final judgment has been reached in *Pinnacle I*.

## ORDER

**IT IS ORDERED:**

1. Defendant's Motion to Dismiss (Dkt. 20) is **GRANTED**. Plaintiff's Count III (negligence) is DISMISSED WITH PREJUDICE.

2. Defendant's Motion for Summary Judgment (Dkt. 13) is **GRANTED IN PART and DENIED IN PART**. Plaintiff's Count I (violation of Idaho's Real Estate Brokerage Representation Act), Count IV (breach of contract) and Count V (breach of the implied covenant of good faith and fair dealing) are DISMISSED WITH PREJUDICE.

3. Plaintiff's Motion to Consolidate (Dkt. 12) is **DENIED**.

4. This case is HEREBY STAYED until the Court enters a final judgment in 4:13-cv-106-DCN.

DATED: October 26, 2017

David C. Nye
U.S. District Court Judge